UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SUSAN R. HEATON, )
)
    **Plaintiff,** )
) No. 05 C 1321
v. )
) Judge John W. Darrah
SEARS, ROEBUCK & CO., )
)
    **Defendant.** )

## MEMORANDUM OPINION AND ORDER

Plaintiff, Susan Heaton, filed suit against Defendant Sears, Roebuck & Co., alleging sex discrimination, violation of the Illinois Wage Payment and Collection Act ("IWPCA"), and violation of the Illinois and Indiana Right(s) of Publicity Acts. Presently before the Court are Sears' Motion for Partial Summary Judgment and Heaton's Motion for Partial Summary Judgment.

## BACKGROUND

On September 25, 2000, Sears hired Heaton as a Store General Manager-In-Training. Heaton originally reported to work at the Oakbrook, Illinois store but later trained at the State Street store in Chicago, Illinois. (Def.'s 56.1 Statement ¶ 2). Sears' August 29, 2000 offer letter to Heaton stated, in relevant part:

> You will be eligible for an annual incentive target opportunity of $20,000, pro-rated, based on your start date. The actual amount of the incentive earned will be based on 50% of the performance of your business group and 50% of the company's EPS (Earnings Per Share). Your incentive payment may range from 0% to 230% of your targeted amount, dependent on business performance. Incentive dollars (monies) for each calendar year will be payable at the end of February of the following year, provided that you are actively employed through the end of the final month of the incentive plan year.
> You should not regard this letter, or other statements, policies or representations, as a contract of employment.

(Id., ¶ 9). Sears' annual incentive bonus policy that was in effect at the time of Heaton's termination stated, in relevant part:

> An incentive award may be withheld from an otherwise eligible associate who leaves the company after the end of the incentive period before payment of the incentive award if the reason for leaving is the result of dishonest, unethical conduct or misconduct (Solar reason codes for violation of rules, integrity and harassment).
> Note: This information describes Sears Incentive Program. It is intended to give you advance information regarding the measures used to calculate your incentive. The financial measures are business plan specific. This notice does not constitute a contract or agreement as the measures may change or may not reflect your job assignment. It may also be amended or terminated at any time at the company's sole discretion.

(Id., ¶ 10). Sears' Associate Handbook includes a section entitled "Personal Conduct," which lists examples of conduct that can lead to termination of employment, including "theft or dishonesty" and "violation of company policy." (Id., ¶ 7). Sears' Freedoms and Obligations Code of Business Conduct states, in relevant part:

> It is the policy of Sears, Roebuck & Co. to require that all associates strictly avoid conflicts of interest in which associates might use their position as the Company to benefit personally . . . at Sears' expense. This policy includes avoidance of the appearance of such conflict of interests . . .
> Managers have a special responsibility to make fair decisions, encourage ethical behavior by associates, and serve as role models to all associates.

(Id., ¶ 8).

On July 16, 2001, Heaton was promoted to Store General Manager ("SGM") at the Matteson, Illinois store. (Def.'s 56.1(a)(3) Statement ¶ 3). The SGM is the head Sears employee at each store and reports to the District General Manager ("DGM"). (Id., ¶ 4). During the first six to seven months as the SGM for the Matteson store, Heaton reported to Chicago South District

DGM Roger Millard. (Id., ¶ 5). In January 2002, Robert Poss became the DGM for the Chicago South District. (Id., ¶ 6).

In the Summer of 2002, DGM Poss told Heaton that she needed to "recognize [her] people" and that "we have many programs in place, you need to run this through the appropriate accounts." (Def.'s 56.1(a)(3) Statement ¶ 11). Poss was upset that Heaton was not recognizing her people on a regular basis. (Id., ¶ 12). Based on Poss's comments, Heaton believed she was to "take care of her entire staff, including [herself], for year-end gifts." (Id., ¶ 13).

In December 2002, Heaton used a Sears corporate account credit card to purchase $40-$50 crystal decanters from the Mikasa outlet store in Michigan City for herself and the Matteson assistant managers. Heaton also purchased $12-$15 crystal candy holders from Sears for her lead managers. (Def.'s 56.1(a)(3) Statement ¶ 15). Poss approved all of the 2002 charges. (Plaint.'s 56.1(b)(3) Statement ¶ 21).

In March 2003, Poss questioned Heaton about charges that appeared on the Sears corporate account credit card statement, including the charges for the December 2002 gifts. (Def. 56.1(a)(3) Statement ¶ 16). Heaton told Poss that the charges were for year-end gifts and that she had saved money because she went to an outlet mall in Michigan City. (Id., ¶ 17). Poss left Sears in November 2003, and Wendy Carges became the DGM for the Chicago South District. (Id., ¶ 19).

In December 2003, Heaton used Sears funds to purchase $50 Sears gift cards for herself and her assistant managers and $30 gift cards for her lead managers. (Def.'s 56.1(a)(3) Statement ¶ 20). Heaton did not ask Carges for approval to give herself a gift card, and Carges never approved the gift card for Heaton. (Id., ¶ 21). Christy Smolen, an Assistant Operations Manager, reviewed and

approved the 2003 gifts to employees, except Heaton's, after they had been purchased. (Plaint.'s 56.1(b)(3) Statement ¶6).

In February 2004, District Operations Manager John Levesque notified Carges that Heaton had purchased a gift card for herself using store funds. (Def.'s 56.1(a)(3) Statement ¶ 23). Carges instructed Levesque and the loss prevention team to conduct an investigation. (Id., ¶ 24). On February 12, 2004, Loss Prevention Manager Pat Gallo, along with another loss prevention employee, Susan Smith Peterson, met with Heaton and told her that they needed to talk to Heaton about the gift cards she had given out in December 2003. (Id., ¶ 25). Heaton informed Gallo and Peterson that Poss had pre-approved the gifts. (Id., ¶ 26). At Gallo's request, Heaton prepared a written statement about the December 2003 gift cards. (Id., ¶ 27). A few days later, Carges spoke with Heaton. Heaton informed Carges that she had the incentives pre-approved as it had been initiated in the previous years and that she knew other managers that were doing the same thing. Carges told Heaton that she did not know what was going to happen but that the situation would be handled as quickly as possible. (Id., ¶ 28).

Ultimately, Carges decided that Heaton should be terminated for an ethics violation, specifically, purchasing a gift card for herself with store monies. (Def.'s 56.1(a)(3) Statement ¶ 29). Prior to finalizing the decision to terminate Heaton, Carges spoke to the Regional Human Resources Director for Stores, Donna Desilets, who agreed with and approved Carges's discharge recommendation. (Id., ¶ 30). On February 21, 2004, Carges and Levesque met with Heaton and informed her that she was being terminated. (Id., ¶ 31).

Carges also asked Levesque to further investigate Heaton's assertions that other managers were also purchasing gifts for themselves. (Def.'s 56.1(a)(3) Statement ¶ 32). Levesque reviewed

4

accounting ledger data, including monthly summaries, sub-accounts, and journal entries for all twelve stores in the Chicago South District. (Id., ¶ 33). Levesque also personally visited the State Street and Calumet City stores because Carges believed that Heaton had intimated that long-term store managers had purchased gifts for themselves, and the SGMs at the State Street and Calumet City stores were long-term managers. (Id., ¶ 34). Levesque reviewed the hard copy files at the State Street, Calumet City, and Matteson stores for any evidence suggesting that the SGMs had purchased gifts for themselves using store funds. (Id., ¶¶ 35-36). Except for Heaton, Levesque found no evidence that any SGMs gave themselves a gift using store funds. (Id., ¶ 37).

Heaton believes that SGM Dave Allen, Dave Johnson, Melinda George, and Carole Van Horne purchased gifts for themselves using store funds but were not terminated.. (Def.'s 56.1(a)(3) Statement ¶¶ 39-42). Heaton believes that Johnson gave himself a motivational book because he gave his employees that motivational book and he had one himself. (Id., ¶ 41). In 2002, Allen told Heaton that it was appropriate for managers to give themselves gifts and that he gave himself the gifts that he gave his employees. (Plaint.'s Dep. pp 195-98). All of these purported gifts were given prior to Carges's becoming DGM of the Chicago South District. (Def.'s 56.1(a)(3) Statement ¶ 43). Carges is unaware of any SGM other than Heaton using store funds to purchase a gift for himself or herself. (Id., ¶ 44).

When Sears paid out its incentive payments in March 2004 for the 2003 year, it did not make a bonus payment to Heaton because she was terminated for, what Sears perceived to be, unethical conduct. (Def.'s 56.1(a)(3) Statement ¶ 45). Heaton asserts that former SGMs Mike Mast, Will Reed, and John Spencer and former manager of loss prevention, Pat Gallo, were treated more favorably than she because they received incentive bonuses after their employment ended. (Id., ¶

5

46). Mast, Reed and Spencer retired on October 31, 2003, October 31, 2003 and October 16, 2004, respectively; none of them were terminated because of any ethics or integrity issues. (Id., ¶ 47). Gallo was terminated on October 9, 2004, for performance-related issues. Gallo was not terminated for ethics or integrity reasons. (Id., ¶ 48).

Sears periodically sends a mailer, the "High Ticket Thank You" ("Mailer"), to select customers. The purpose of the Mailer is to solicit sales and bring customers into the stores. The Mailer thanks the customer for a recent purchase and invites the customer to return to Sears and provides coupons for the return visit. In June 2004, Sears sent 267 Mailers to selected customers for the Matteson, Illinois store. The Mailer contained a "personal letter" signed by Heaton, and the envelope contained the return address of Sears with Heaton's name and position. (Plaint.'s 56.1(a)(3) Statement ¶ 9). Heaton was not employed by Sears at the time of the mailing. (Id., ¶ 10). Heaton did not give permission to Sears to use her name and signature. (Plaint.'s 56.1(b)(3) Statement ¶ 28).

Following her termination from Sears, Heaton worked as a real estate agent for Coldwell Banker in Frankfort, Illinois. (Def.'s 56.1(a)(3) Statement ¶ 49). In October or November 2004, a co-worker of Heaton received a copy of the June 2004 "Mailer" at his home in Illinois. (Id., ¶ 50). Some of Heaton's clients also informed Heaton that they had received items in the mail from the Sears in Matteson that included Heaton's name. (Id., 51). Heaton believes that the Mailer harmed her real estate career because "at least a couple" of potential clients would not list with her. (Id., ¶ 53).

6

## ANALYSIS

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." Fed R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986) (*Celotex*). All of the evidence and the reasonable inferences that may be drawn from the evidence are viewed in the light most favorable to the nonmovant. *Miller v. American Family Mutual Ins.*, 203 F.3d 997, 1003 (7th Cir. 2000). Summary judgment may be granted when no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (*Anderson*). However, a party cannot defeat summary judgment by relying on unsubstantiated facts. *See Greer v. Board of Educ. of the City of Chicago*, 267 F.3d 723, 729 (7th Cir. 2001) (*Greer*).

### *Gender Discrimination Claim*

Heaton may prevail on her discrimination claim either through the "direct method" – showing intentional discrimination – or through the similar burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Blise v. Antaramian*, 409 F.3d 861, 866 (7th Cir. 2005) (*Blise*). Heaton does not present direct evidence of discrimination and concedes that she must proceed under the *McDonnell Douglas* rubric.

To establish a *prima facie* case of gender discrimination under the *McDonnell Douglas* framework, Heaton is required to demonstrate that: (1) she was a member of a protected class; (2) she was meeting her employer's legitimate performance expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than at least one similarly-situated male

7

employee. *See Farrell v. Butler University*, 421 F.3d 609, 650 (7th Cir. 2005). If Heaton demonstrates a *prima facie* case, the burden shifts to Sears to demonstrate "a legitimate, nondiscriminatory reason for the action." *Blise*, 409 F.3d at 867. If Sears meets this burden, the burden shifts back to Heaton to demonstrate the proffered reason is pretextual. *Blise*, 409 F.3d at 867.

Heaton, a female, is a member of a protected class and suffered an adverse employment action – termination from Sears. However, Heaton was not meeting her employer's legitimate performance expectations because she engaged in unethical conduct by misappropriating company funds by giving herself a gift card in violation of the Code of Business Conduct. Heaton argues that her conduct was acceptable by the previous management; therefore, she was meeting Sears' legitimate expectations. Whether Heaton was meeting Sears' legitimate expectations must be viewed at the time of termination, not at a time previous to that time. *See Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 336 (7th Cir. 1991). The undisputed facts demonstrate that Carges, Heaton's supervisor at the time of her termination, believed that Heaton engaged in unethical conduct, requiring Heaton's termination. Accordingly, Heaton was not meeting her employer's legitimate expectations.[1]

As to the fourth element, Heaton argues that she was treated differently than two male general manager counterparts, Dave Allen and Ray Morris, because they also gave gifts to themselves. A plaintiff demonstrates that another employee is "similarly situated" to her by "show[ing] that there is someone who is directly comparable to her in all material aspects."

---

[1] Heaton argues that because a previous manager permitted gift giving, Sears is bound by this conduct, rendering her termination unlawful. This may give rise to a breach of contract or wrongful discharge charge but does not, alone, support a gender discrimination claim.

8

*Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). A court must look at all relevant factors, the number of which depends on the specific case, when making this determination. *See Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000).

Even assuming that Heaton's allegations that these male managers gave themselves gifts, Heaton has failed to demonstrate that they are similarly situated to her in all material aspects. Heaton has not demonstrated that these managers were supervised by Carges or that Carges learned of the gifts and did not take any type of corrective actions.[2] Significantly, Heaton does not deny that any gifts she believes other managers gave to themselves were prior to Carges's becoming DGM of the Chicago South District.

In her Second Amended Complaint, Heaton also alleges that she was discriminated based on not receiving her 2003 incentive bonus. Heaton does address these allegations or make any argument to support this as an additional basis for her gender discrimination claim. Also, Heaton has failed to demonstrate that similarly situated male employees received a bonus after leaving Sears' employ under similar conditions as Heaton. The male employees that Heaton identified in her deposition are not similarly situated because three of the four employees voluntarily retired from Sears' employ and the other employee was terminated for performance issues, not for unethical behavior.

Even if Heaton had presented a *prima facie* case of gender discrimination, she fails to demonstrate that Sears' reason for her termination was a pretext to discrimination. Sears' alleged nondiscriminatory reason for terminating Heaton was her unethical act of giving herself a gift card

---

[2]Contrary to her gender discrimination claim, Heaton identified two other female managers, Melinda George and Carole Van Horne, that Heaton alleges gave themselves gifts but were not terminated.

with store funds. A plaintiff can establish pretext by showing that the employer's explanation is unworthy of credence or that a discriminatory reason more likely motivated the employer. *Debs v. Northeastern Illinois Univ.*, 153 F.3d 390, 395 (7th Cir. 1998) (*Debs*). Pretext in this context does not mean a mistake; rather, it means "a lie, specifically a phony reason for some action." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir 1995).

Heaton argues that pretext has been demonstrated because her conduct was acceptable by the previous management. However, Heaton's supervisor at the time of her termination believed that Heaton engaged in unethical conduct, requiring Heaton's termination. Heaton has failed to demonstrate that the reason for termination was unworthy of credence or that a discriminatory reason likely motivated the employer.

Based on the above, summary judgment is granted in Sears' favor on Heaton's gender discrimination claim.

### *Illinois Wage Payment and Collection Act Claim*

Sears argues that Heaton's IWPCA claim fails because she cannot demonstrate that there was a contract or agreement between Heaton and Sears regarding payment of the incentive program. Heaton argues that Sears' August 29, 2000 letter of employment constitutes an agreement between the parties for the incentive bonus.

The IWPCA provides that an employer must pay the "final compensation of separated employees in full, at the time of separation, if possible, but in no case later than the next regularly scheduled payday for such employee." 820 ILCS 115/5. "Final compensation" is defined, in relevant part, as "wages, salaries, earned commissions, earned bonuses . . . and any other compensation owed the employee by the employer pursuant to an employment contract or agreement

10

between the 2 parties." 820 ILCS 115/2. An "agreement," for purposes of the IWPCA, "is broader than a contract and requires only a manifestation of mutual assent on the part of two or more persons . . . ." *Zabinsky v. Gleber Group, Inc.*, 347 Ill. App. 3d 243, 249 (2004). An express disclaimer in an employee handbook negates a finding of an employment contract and may negate a claim of mutual assent. *See Skelton v. American Intercontinental Univ. Online*, 382 F. Supp. 1068, 1075 (N.D. Ill. 2005) ( *Skelton*) (finding no contract or agreement under the IWPCA due to plaintiff's relying on employee handbook that contained an express disclaimer).

In the instant case, Heaton's August 29, 2000 offer letter discussed the receipt of an incentive bonus and also included a statement that the letter did not represent a "contract of employment." While the offer letter clearly disclaims a "contract of employment," it does not disclaim an agreement to pay an incentive bonus as discussed in the letter. However, the Sears' annual incentive bonus policy specifically states that the "notice does not constitute a contract or agreement as the measures may change or may not reflect your job assignment." This express disclaimer negates a finding of an employment contract and a claim of mutual assent. *See Skelton*, 382 F. Supp. 2d at 1075. Furthermore, the annual incentive bonus policy specifically provides that the bonus may be withheld if an employee is terminated as a result of dishonest or unethical conduct before payment of the award has been received. *See Tatom v. Ameritech Corp.*, No. 99 C 683, 2000 WL 1648931 at * 9 (N.D. Ill. Sep. 28, 2000) (*Tatom*), aff'd 305 F.3d 737, 742 (7th Cir. 2002) (plaintiff did not have viable IWPCA claim when he violated a plan provision that voided the employee's right to a *pro rata* share of unvested options if the employee left employer for a competitor).

Heaton argues that Sears cannot rely on the incentive bonus policy that existed at the time of the termination to avoid payment of her bonus. Heaton cites *Camillo v. Wal-Mart*, 221 Ill. App.

11

3d 614 (1991), in support of her argument. However, the instant case is readily distinguishable. Unlike the bonus plan that supported a IWPCA claim in *Camillo*, Sears' incentive bonus policy: (1) does not unequivocally state that employees are paid a bonus each year[3], (2) does contain a specific disclaimer preventing the emergence of a contract or agreement, and (3) states that an employee may receive the bonus if they are terminated for dishonest or unethical conduct. *See Tatom*, 2000 WL 1648931 at *9 (distinguishing *Camillo* and finding no IWPCA claim where plan document included a disclaimer of contract formation and provided for cancellation of the stock option if the employee joined a competitor). Furthermore, the annual incentive bonus policy specifically states that it may be amended at any time at Sears' discretion.

Based on the above, summary judgment is granted in Sears' favor on Heaton's IWPCA claim.

### *Indiana Right of Publicity Act*

Indiana's publicity act provides, "A person may not use an aspect of a personality's right of publicity for a commercial purpose during the personality's lifetime . . . without having obtained previous written consent from a person . . . ." Ind. Code § 32-36-1-8. The act only "applies to an act or event that occurs in Indiana, regardless of the person's domicile, residence or citizenship." Heaton presents no evidence (and does not contest summary judgment as to this claim in her response brief) that any of the Mailers were received in Indiana. Accordingly, summary judgment is granted in Sears' favor on Heaton's Indiana Rights of Publicity Act claim.

---

[3]The *Camillo* plan stated, "Our assistant managers are paid a bonus each year."

## *Illinois Right of Publicity Act*

Illinois' Right of Publicity Act ("IRPA") limits the use of an individual's identity, providing, in pertinent part: "A person may not use an individual's identity for commercial purposes during the individual's lifetime without having obtained previous written consent . . . ." 765 ILCS 1075/30(a). "Commercial purpose" is defined as "the public use or holding out of an individual's identity (i) on or in connection with the offering for sale or sale of a product, merchandise, goods, or services; (ii) for purposes of advertising or promoting products, merchandise, goods or services; or (iii) for the purpose of fundraising." 765 ILCS 1075/5. An "individual" is defined as " a living or deceased natural person, regardless of whether the identity of that individual has been used for a commercial purpose during the individual's lifetime." 765 ILCS 1075/5. Damages for violating the IRPA include "(1) actual damages, profits derived from the unauthorized use, or both; or (2) $1,000." 765 ILCS 1075/40(a). Punitive damages may also be awarded if the violation was willful. 765 ILCS 1075/40(b).

In the instant case, Sears included Heaton's name, as the General Manager, on the Mailer sent to 267 Sears customers. Heaton is an individual, as defined by the IRPA. Furthermore, her identity (name) was used for the purpose "of advertising or promoting products, merchandise, goods, or services," as defined by the IRPA.

Sears argues that Heaton's claim should fail because she is not a public figure; however, the IRPA applies to "individuals" not just public figures. Sears also argues that a genuine issue of fact exists as to whether Heaton's name was used for a commercial purpose, citing *Newcombe v. Adolf Coors Co.*, 157 F.3d 686 (9th Cir. 1998) (*Newcombe*). *Newcombe* is readily distinguishable. Unlike the IRPA, the California privacy statute at issue in *Newcombe* required a finding of a direct

connection between the use of the individual's identity and the commercial purpose. *Newcombe*, 157 F.3d at 692. That connection between the individual's identity and the commercial purpose was lacking in *Newcombe*. The IRPA does not require this same "connection."

Based on the above, summary judgment is granted on Heaton's IRPA claim in Heaton's favor.

Heaton also seeks partial summary judgment on damages, seeking $267,000, based on a statutory award of $1,000 for each of the 267 Mailers. Heaton seeks to have the other possible damages – lost profits and punitive damages – tried to the jury.

The IRPA provides for either lost profits or $1,000, whichever is greater. Heaton concedes that summary judgment as to lost profit damages is not appropriate at this time. As such, a genuine issue of material fact exists as to which is greater, lost profits or $1,000. Furthermore, the statutory $1,000 damages provided for in a violation of the IRPA may be awarded for the act causing the violation of the IRPA, not for each of the Mailers that were sent. The IRPA specifically provides for "actual damages, profits . . . or $1,000 "; it does not provide for $1,000 "per occurrence." *See also* 765 ILCS 1075/35 ("This act applies to acts or events . . . .").

## CONCLUSION

For the reasons stated above, Sears' Motion for Partial Summary Judgment is granted. Summary judgment is granted in Sears' favor on Heaton's discrimination, IWPCA, and Indiana Rights of Publicity Act claims. Heaton's Motion for Partial Summary Judgment is granted in part and denied in part. Summary judgment is granted in Heaton's favor on Heaton's IRPA claim as to liability only.

Dated: 8/24/06

JOHN W. DARRAH
United States District Court Judge